1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    OLIVER GRAY,                              No. 2:16-cv-1577 JAM KJN P

12                    Petitioner,

13          v.                                  FINDINGS & RECOMMENDATIONS

14    W.L. MUNIZ,

15                    Respondent.

16

17    I.  Introduction

18          Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

19    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2013 conviction for five

20    counts of robbery and the personal use of a firearm, and for being a felon in possession of a

21    firearm.  Petitioner was sentenced to thirty years and four months in state prison.

22          Petitioner asserts the following claims:  (1) petitioner was denied federal due process

23    because he was convicted while he was incompetent to stand trial; (2) the trial court denied

24    petitioner the right to due process and a fair trial by a unanimous and impartial jury by failing to

25    inquire into one juror's ability to comprehend the jury instructions, including the reasonable

26    doubt instruction; (3) petitioner was denied due process and equal protection by the prosecution's

27    withholding of exculpatory evidence; (4) trial counsel was ineffective by failing to investigate and

28    discover the prosecution's suppression of evidence; (5) appellate counsel was ineffective for

                                                 1

failing to raise the prosecution's suppression of evidence; (6) appellate counsel was ineffective for not raising trial counsel's failure to investigate and discover the prosecution's suppression of evidence; (7) the trial court denied petitioner the right to represent himself at trial; (8) trial counsel was ineffective during proceedings to determine whether petitioner should have received the right of self-representation at trial; and (9) appellate counsel was ineffective for not raising trial counsel's ineffectiveness during proceedings to determine whether petitioner should have received the right of self-representation at trial. After careful review of the record, this court concludes that the petition should be denied.

II. <u>Relevant Procedural History</u>

On February 27, 2013, a jury found petitioner guilty of five counts of second degree robbery (Cal. Pen. Code, § 211), and found true five special allegations that petitioner personally used a firearm during the commission of the crimes (Cal. Pen. Code, § 12022.53(b)). (2 CT 433-37; 4 RT 955-62.) Petitioner had previously entered a no contest plea to the crime of being a felon in possession of a firearm (Cal. Pen. Code, § 12021(a)(1)). (1 CT 21, 291; 1 RT 110-18.)

Petitioner filed a petition for writ of habeas corpus in the Sacramento County Superior Court on March 28, 2013. (LD 5.) That court denied the petition on April 12, 2013. (LD 6.)

On May 22, 2013, petitioner filed a petition for writ of error coram nobis in the Sacramento County Superior Court, asking the court to vacate a 2009 conviction for first degree residential burglary. (LD 7.)

Ultimately, on June 3, 2013, petitioner was sentenced to a total of thirty years and four months in state prison. (LD 1.)

On July 11, 2013, the superior court denied the previously-filed petition for writ of error coram nobis. (LD 8.)

Petitioner appealed the conviction to the California Court of Appeal, Third Appellate District. The Court of Appeal affirmed the conviction on November 4, 2014. (LD 2.)

Petitioner filed a petition for review in the California Supreme Court (LD 3), which was denied on January 21, 2015 (LD 4).

////

2

On September 8, 2015, petitioner filed a petition for writ of habeas corpus with the Sacramento County Superior Court.  (LD 9.)  The superior court, in a reasoned decision dated November 6, 2015, denied the petition.  (LD 10.)

Petitioner filed a petition for writ of habeas corpus in the Third District Court of Appeal on February 22, 2016.  (LD 11.)  The state appellate court denied the petition without comment on February 25, 2016.  (LD 12.)

Thereafter, on April 11, 2016, petitioner filed a second petition for writ of habeas corpus with the Third District Court of Appeal.  (LD 13.)  The petition was summarily denied on April 14, 2016.  (LD 14.)

On May 16, 2016, petitioner filed a petition for writ of habeas corpus with the California Supreme Court.  (LD 15.)  On June 29, 2016, the state supreme court summarily denied the petition.  (LD 16.)

Petitioner filed the instant petition on July 11, 2016.  (ECF No. 1.)  Counsel was appointed on November 9, 2016.  (ECF No. 10.)  A first amended petition for writ of habeas corpus was filed on February 24, 2017.  (ECF No. 18.)

On May 9, 2017, respondent filed a motion to dismiss.  (ECF No. 24.)  Following briefing (ECF Nos. 27-28, 31, 34 & 37), the undersigned issued findings, recommending the motion to dismiss be denied.  (ECF No. 38.)  Ultimately, the district judge adopted the findings and recommendations and ordered the motion denied.  (ECF No. 41.)

On May 18, 2018, respondent filed its answer.  (ECF No. 44.)  On June 13, 2018, petitioner filed a traverse.  (ECF No. 47.)

III.  Facts[1]

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

---

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Gray, No. C074022 (11/4/2014), a copy of which was lodged by respondent as Lodged Document 2.

# FACTUAL AND PROCEDURAL BACKGROUND

We omit a recitation of the underlying facts, as they are immaterial to our resolution of defendant's appeal. For our purposes, it is sufficient to say that in May 2011, defendant was charged with robbery and a number of other offenses stemming from an incident two days earlier. At a hearing near the end of June 2011, defense counsel expressed a doubt as to defendant's competence, and the trial court (Judge Marjorie Koller) immediately suspended the proceedings and ordered that defendant be examined.

Dr. Charles B. Schaffer, a psychiatrist and diplomate with the American Board of Psychiatry and Neurology, conducted a psychiatric evaluation of defendant and produced a report dated July 20, 2011. Dr. Schaffer concluded that defendant had the ability to understand the proceedings and to assist his counsel in a rational manner. Initially, defense counsel requested a trial on the issue of defendant's competency. Subsequently, however, the matter was referred back to Dr. Schaffer for a further evaluation,[1] and he produced a supplemental report dated October 3, 2011, in which he once again concluded that defendant had the ability to understand the proceedings and to assist his counsel in a rational manner. Two days later, on October 5, the parties submitted the matter based on Dr. Schaffer's supplemental report, and the court found defendant competent and reinstated the criminal proceedings.

> [FN 1:] Apparently the matter was referred back to Dr. Schaffer at defense counsel's request based on defendant's "limited cooperation during the initial evaluation and additional information from counsel and defendant's family."

In April 2012, defendant filed a *Faretta*[] motion. The court (Judge John Winn) appointed Dr. Paul G. Mattiuzzi to determine if defendant was competent to represent himself. Dr. Mattiuzzi examined defendant in May and concluded that defendant was not competent to represent himself. At a hearing in June, the parties submitted on Dr. Mattiuzzi's report, and the court denied the *Faretta* motion.

Meanwhile, in preparation for trial, defense counsel arranged for a comprehensive neuropsychological evaluation of defendant by Dr. John J. Wicks, a forensic neuropsychologist. Dr. Wicks conducted his evaluation over three days in April and May 2012 and produced a report dated July 16, 2012. Based on that report, defense counsel decided to have a PET scan conducted on defendant's brain to determine if any organic neurological defect could be detected. In August 2012, the parties agreed to continue the trial to September to allow defense counsel to obtain the scan. In September, defense counsel moved for a further continuance because she needed a psychiatrist or neurologist to order the scan and had not yet been able to get the order. Consequently, the court continued the trial again, ultimately setting a trial date in January 2013.

A week before the scheduled trial date of January 17, 2013, defense counsel put the case on calendar so that she could again express a

doubt about defendant's competence. This time, defense counsel informed the court that she believed defendant had a developmental "deficiency under [Penal Code section] 1368." She stated that the brain scan was completed in November, and based on her conversations with the neuropsychiatrist who ordered the scan (Dr. Albert Globus), as well as review of the radiologist's report of the scan, there were "confirmed areas of ... brain damage consistent ... with Dr. Wicks' earlier report which was based on family history, on educational records, [and] juvenile probation reports of Mr. Gray dating back to when he was eight years old." Defense counsel contended the scan results were "a hard science confirmation and validation of Dr. Wicks' neuro psych evaluation...." She sought a referral for further examination by "psychologists [who are] available who can focus on developmental disabilities and focus more on his abilities and lack of abilities...."

In opposition to the request for another competency hearing, the People argued that Dr. Wicks's report did not justify a further competency hearing because it did not disclose a substantial change of circumstances or new evidence casting serious doubt on the validity of the prior finding of competence.

The court stated that while both attorneys were "spending a lot of time on Dr. Wicks' report," that report had never been submitted to the court. Defense counsel provided a copy of the report to the court, and the court reviewed the report before calling the matter again later that afternoon. After both attorneys submitted without offering further evidence, the court explained that it was a "difficult case" because the competency issue was considered earlier based on whether defendant "ha[d] a mental illness that require[d] psychiatric treatment and medication," while "[t]he issue now is whether or not it's a type of developmental disability." Noting again that it was "a close case," the court concluded as follows: "[W]hen I review it all, I think my thought is that based upon everything I've seen, I think Mr. Gray is at this point competent to stand trial. So I'm not going to suspend proceedings again. I've had some interaction with Mr. Gray directly because at one point he wanted to represent himself. Actually, if it wasn't for the fact that we suspended proceedings, I would have never appointed a doctor probably to meet with Mr. Gray. You know, even though it's a close case, I do feel that at this point he is able to assist counsel and able to understand the nature of the proceedings. So I am going to deny the request to suspend criminal proceedings at this point."

The case was tried to a jury in February 2013. On the third day of jury deliberations, the jury foreperson asked to speak to the court (Judge Michael Kenny). After the court warned the foreperson not to say anything about the jury's deliberations, the foreperson told the court the following:

"My concern is with what a juror's literacy level is. We have a juror who I do not believe has the comprehension to be able to read the instructions as given to her. I'm concerned, because we have tried to explain in different modes and modalities. I teach special needs students, and I have tried numerous ways to see if we can get her to

5

comprehend what 'reasonable' means and what 'beyond a reasonable doubt' means, and it's been stalling us." The court then ascertained from the foreperson that the juror at issue was participating in deliberations and while the foreperson believed the juror had "limited literacy," the other jurors had read the instructions "out loud to her," "but it did not seem to help."

The court then allowed the attorneys to ask questions, and the prosecutor asked whether the juror appeared to understand the instructions; the foreperson said it did not appear so. The court prohibited the foreperson from explaining the basis of her conclusion that the juror did not understand the instructions, however, because "[t]hat is going into deliberations." The foreperson then reiterated that multiple people had read the instructions, the instructions had been read slowly, and they "[e]ven had [the juror] track with her finger along with the text."

The court told the foreperson, "it sounds like you are doing everything that the Court would request you to do," and "individuals have varying interpretations at times, based on the facts as they have determined them through the process of the trial." Accordingly, the court directed the foreperson to return and continue deliberating.

Outside the presence of the foreperson, the prosecutor argued that the problem appeared to be more than a difference of opinion; "[i]t sounds like the juror does not understand the instruction itself, or the juror cannot understand the instructions." The court disagreed, stating that "it all boils around what is reasonable and what is not reasonable. And it sounds like substantial jurors have reached a determination of facts of what is reasonable, and that this juror does not believe that, in fact, that interpretation is reasonable." The prosecutor proposed that the court ask the juror if she understood the instructions as they were read to her without asking her about her opinion, but the court declined to do so because the court understood "that there was a difference [of opinion] with regard to—as to what reasonable doubt is." Ultimately, the court decided to "wait and see." That afternoon, without further incident, the jury returned its verdict.

(People v. Gray, LD 2 at 1-3.)

IV. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's

decisions, but unreasonably applies that principle to the facts of the prisoner's case. [2] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams v. Taylor, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. at 411. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a "'firm conviction'" that the state court was "'erroneous'""). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised").

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

8

previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 298 (2013) (citing Richter, 562 U.S. at 98). If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court. Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

9

decision of [the Supreme] Court." Id. at 101. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006).

V. <u>Petitioner's Claims</u>

A. *Denial of Due Process: Incompetent to Stand Trial*

Petitioner claims that he was denied due process because he was incompetent to stand trial. (ECF No. 18 at 19-33; ECF No. 47 at 5-10.) Respondent maintains the state court's determination was reasonable, thus, petitioner is barred from relief in this court. (ECF No. 44 at 18-24.)

The last reasoned rejection of petitioner's first claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

> Defendant first contends that the trial court erred in failing to suspend the criminal proceedings and appoint the director of the regional center for the developmentally disabled to examine him in January 2013 because Dr. Wicks's report and the PET scan findings constituted substantial evidence that he was not competent to stand trial because he was suffering from a developmental disability. We disagree.
>
> Penal Code "[s]ection 1367, subdivision (a) states that a 'defendant is mentally incompetent ... if, as a result of mental disorder or developmental disability, [he] is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' "'When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. [Citation.] Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competence to stand trial.'" (*People v. Weaver* (2001) 26 Cal.4th 876, 953.)
>
> *A different rule applies*, however, after the trial court has found the

defendant to be competent and the issue of his or her competency is being raised for a second time. "'Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence.'" (*People v. Weaver, supra*, 26 Cal.4th at p. 954.)

Defendant fails to argue his case in light of the foregoing rule and instead insists on arguing the substantial evidence test that applies to an initial determination of a defendant's competency.[] To justify this approach, defendant contends that "two related but different procedures" apply in this context depending upon whether the defendant is suspected to be incompetent to stand trial because of a mental disorder or because of a developmental disability. According to defendant, "[i]n the typical case, where the question is whether a defendant is incompetent due to a psychiatric illness or mental disorder, 'the court shall appoint a psychiatrist or a licensed psychologist, and any other expert the court shall deem appropriate, to examine the defendant.' [Citation.] However, if it is suspected that the defendant is incompetent and suffers from a developmental disability, such as a neurological disorder, the court must 'appoint the director of the regional center for the developmentally disabled ... to examine the defendant.'" (Fn. omitted.) In defendant's view, because "Dr. Wicks' report presented new evidence of a neurological impairment akin to intellectual disability based on multiple testing corroborated by [defendant's] PET scan, as opposed to any mental disease or illness that had previously been evaluated by Dr. Schaffer [citation], the trial court was duty-bound to refer [defendant] to the regional center...."

Defendant is mistaken. The duty of the trial court to declare a doubt as to the defendant's competency, suspend proceedings, and conduct a full-blown competency hearing arises "[w]hen defense counsel has presented [or the court otherwise becomes aware of] substantial evidence that a defendant is incompetent to stand trial." (*People v. Jones* (1991) 53 Cal.3d 1115, 1153; see also Pen.Code, § 1368.) It is only after the court has declared a doubt and suspended proceedings that the court must "appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant" (Pen.Code, § 1369, subd. (a)), unless "it is suspected the defendant is developmentally disabled," in which case "the court shall appoint the director of the regional center for the developmentally disabled ... or the designee of the director, to examine the defendant" (*ibid*.).

Under the foregoing provisions, the duty to suspend proceedings and conduct a competency hearing is triggered by substantial evidence that a defendant is incompetent to stand trial—regardless of the basis for that suspected incompetence. The basis for the defendant's suspected incompetence comes into play only after the court has ordered a competency hearing, and that basis affects only whether the court is required to appoint a psychiatrist or licensed psychologist to examine the defendant or instead is required to appoint the director of the regional center for the developmentally disabled or the

1    director's designee.

2    Thus, the fundamental issue in each case is not what the basis is for
     the defendant's suspected incompetence—a mental disorder or a
3    developmental disability—but rather whether the defendant is
     incompetent, whatever the basis of that incompetence may be. In
4    light of this fact, the rule governing second competency hearings
     applies regardless of the fact that the renewed questioning of the
5    defendant's competence rests on a different basis than the original
     questioning of his competence. In other words, a court's initial
6    determination of competency is presumed correct, regardless of
     whether the suspected incompetence was based on a mental disorder
7    or a developmental disability, and a second competency hearing is
     required only if: (1) there is evidence of a substantial change of
8    circumstances; or (2) new evidence is presented that casts serious
     doubt on the validity of the prior finding of competence. (*People v.*
9    *Weaver, supra*, 26 Cal.4th at p. 954.)

10   Here, defendant makes no attempt to show that Dr. Wicks's report
     and the results of the PET scan of his brain cast serious doubt on the
11   determination of his competency that the trial court made in October
     2011 based on Dr. Schaffer's two evaluations. While the PET scan
12   results may well have provided a basis for believing that defendant
     was suffering from a developmental disability consisting of brain
13   damage dating back to his youth,[FN] defendant fails to explain how
     those results, even when read along with Dr. Wicks's report, cast
14   serious doubt on the determination barely a year earlier that
     defendant was *competent to stand trial*. It is not enough for defendant
15   to argue, as he does, that Dr. Wicks's "determination that [defendant]
     suffered from significant neurological impairment documented from
16   an early age was sufficient to raise a doubt and most certainly a
     suspicion of a handicapping condition found to be closely related to
17   intellectual disability that was of such a severe nature and affected
     [defendant]'s brain everywhere to such a degree that the deficiencies
18   could not be compensated for." Instead, defendant needed to show
     how Dr. Wicks's conclusions, especially when considered in light of
19   the PET scan results, cast serious doubt on the trial court's prior
     determination that defendant was competent to stand trial because he
20   was both able "to understand the nature of the criminal proceedings"
     and "to assist counsel in the conduct of a defense in a rational
21   manner." (Pen.Code, § 1367, subd. (a).) Having failed to make any
     such showing, defendant has failed to overcome the "'great
22   deference'" we must give the trial court's ruling that a second
     competency hearing was not required here. (*People v. Weaver, supra*,
23   26 Cal.4th at p. 953.) Accordingly, we find no error in the court's
     refusal to suspend the proceedings and conduct a second hearing on
24   defendant's competence to stand trial.

25         [FN 4:] We note that the only evidence of the PET scan
           results before the trial court at the time at issue here consisted
26         of defense counsel's statements to the court regarding those
           results. For our purposes, however, we take those statements
27         as an offer of proof.

28   (People v. Gray, LD 2 at 3-4.)

Applicable Legal Standards

2          The trial of an incompetent defendant violates the Constitution's Due Process Clause.

3   Drope v. Missouri, 420 U.S. 162, 171 (1975).  The federal constitutional standard for competence

4   to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer

5   with a reasonable degree of rational understanding," and whether he has "a rational as well as

6   factual understanding of the proceedings against him."  Dusky v. United States, 362 U.S. 402

7   (1960) (per curiam).

8          When a trial court possesses evidence that "raises a 'bona fide doubt'" as to a defendant's

9   competence to stand trial, the judge must conduct a competency hearing.  Pate v. Robinson, 383

10  U.S. 375 (1966).  A "bona fide doubt" exists when "a reasonable judge, situated as was the trial

11  court judge whose failure to conduct an evidentiary hearing is being reviewed, should have

12  experienced a doubt with respect to competency to stand trial."  Maxwell v. Roe, 606 F.3d 561,

13  568 (9th Cir. 2010) (quoting de Kaplany v. Enomoto, 540 F.2d 975, 983 (9th Cir. 1976) (en

14  banc)).  The responsibility to consider whether to conduct a competency hearing continues

15  throughout a trial.  Drope, 420 U.S. at 181.

16         Factors for a court to consider in determining whether there is a bona fide doubt about a

17  defendant's competence include evidence of a defendant's irrational behavior, his demeanor at

18  trial, and any prior medical opinion on competence to stand trial.  Drope, 420 U.S. at 180.  A trial

19  court should also consider the opinion of a defendant's trial lawyer, as that lawyer "is in the best

20  position to evaluate a client's comprehension of the proceedings."  Stanley v. Cullen, 633 F.3d

21  852, 861 (9th Cir. 2011) (quotation omitted).  A trial lawyer's professed inability to communicate

22  with a defendant, "while not necessarily sufficient to create a bona fide doubt, should [be]

23  considered seriously by the court."  Torres v. Prunty, 223 F.3d 1103, 1109 (9th Cir. 2000).  A

24  court should also evaluate its own interactions with the defendant, including whether "the

25  defendant is alert," able to testify coherently, and participating in colloquies with the court.

26  United States v. Lewis, 991 F.2d 524, 528 (9th Cir. 1993).

27  ////

28  ////

The Ninth Circuit has previously held the following:

> The question as to when a second examination under the section is required is a question which depends upon the showing made, and the length of time elapsed from the prior psychiatric examination. Obviously a court would not be required to order a hearing during each week of a trial, absent unusual circumstances. The decision whether to require a second examination rests in the sound discretion of the trial court. The trial court's decision will not be upset unless there is abuse of that discretion.

United States v. Bodey, 547 F.2d 1383, 1385-87 (9th Cir. 1977).

Under AEDPA, a state trial or appellate court's finding that a competency hearing was not required is a factual determination entitled to deference unless it is unreasonable. 28 U.S.C. § 2254(d)(2); Mendez v. Knowles, 556 F.3d 757, 771 (9th Cir. 2009).

Pertinent Proceedings

On June 27, 2011, defense counsel declared a doubt as to petitioner's competency pursuant to California Penal Code section 1368; the court suspended proceedings as a result. (Supp RT 5-6; 1 CT 2.) Dr. Charles Schaffer was appointed by the court to assess petitioner's competency. (1 CT 33-34; see also 1 CT 61-63.) Dr. Schaffer submitted a report dated July 20, 2011. (Sealed CT 37-56.) Defense counsel requested a trial on the issue of petitioner's competency in August 2011 (1 CT 3), but on September 16, 2011, counsel sought a continuance and the court "re-refer[red]" to Dr. Schaffer (1 CT 4). Dr. Schaffer submitted a second report dated October 3, 2011. (Sealed CT 66-99.)

On October 5, 2011, the parties submitted on Dr. Schaffer's report; the trial court declared petitioner competent to stand trial and criminal proceedings were reinstated. (Supp RT 9-10; 1 CT 4.)

On January 11, 2013, defense counsel again declared a doubt as to petitioner's competency. (Supp RT 13; see also 1 CT 18.) The trial court considered the parties' arguments (Supp RT 13-20) before ruling that petitioner was competent to stand trial, and "is able to assist counsel and able to understand the nature of the proceedings." (Supp RT 21.)

Thereafter, on February 5, 2013, defense counsel advised the court she had concerns petitioner was "disengaged" and contemplating suicide. The court referred petitioner for a

14

psychiatric evaluation at the jail facility at counsel's request.  (1 CT 276; ECF No. 46-4 at 56-59.)  The following afternoon, and in receipt of the psychiatric report prepared by jail psychiatric services (Sealed CT 286) and after consideration of the parties' argument, the trial court declined to declare petitioner incompetent to stand trial.  (1 CT 284; ECF Doc. 46-4 at 61-77.)

<u>Analysis</u>

Petitioner's argument that he "presented substantial evidence that triggered the trial court's duty to refer him to Regional Center" is unavailing.  More specifically, petitioner contends that by failing to suspend proceedings and "'appoint the director of the regional center for the developmentally disabled'" (ECF No. 18 at 31), the trial court failed to "'observe procedures adequate to protect a petitioner's right "not to be tried or convicted while incompetent to stand trial."'"  (ECF No. 18 at 32.)

The undersigned agrees with respondent that the state court's decision is neither contrary to Supreme Court precedent nor is it unreasonable.

On February 5, 2013, defense counsel indicated she had doubts as to petitioner's competency, "not just for mental illness, which has been covered previously, but also on the basis of his cognitive – his cognitive deficiencies." (1 RT 48.)  The prosecutor objected, pointing out that after an initial finding of competence, a new request requires a greater burden on petitioner's part, and that the required showing had not been made.  (1 RT 48-49.)  The trial court responded:

> THE COURT: Well, there do appear to be two issues that are raised by [defense counsel]. One was the Defendant's current psychological state in terms of a letter that he provided to her before lunchtime. And it seems at a minimum the Court would actually refer Mr. Gray to the jail psych ward for at least some psychological evaluation so we could have that information.
>
> In addition to that, the Court would note that in fact Mr. Gray did seem disengaged through this morning.  However, the Court has not had a chance to review the doctors' reports that were previously prepared in response to a 1368 determination.
>
> So the Court would, actually, like a chance to review those, but also give [the prosecutor] a chance to review anything he wishes to review. [Defense counsel], you could have the same opportunity. And then we could also have the benefit of any psychological evaluation that might be prepared over night by the jail doctors.
>
> So my suggestion at this point in time is a doubt would not be

15

declared by this court, and that we'll put the matter over for one day so that we can get the benefit of jail psych report and the Court can then have an opportunity to review previous reports.

(1 RT 48-50.)  The next day, in receipt of the jail psychiatric unit report, the court indicated it did

not appear the issue needed to be revisited but inquired further of defense counsel.  The following

colloquy then occurred:

> [DEFENSE COUNSEL]: … Well, first of all, I don't think [jail psychiatric staff] had the time to engage in the same type of analysis as, obviously, the other individuals have, since as far as reviewing for competency I still believe -- I still believe that he's going to have he had difficulty yesterday; that he will continue to have difficulty understanding the Court proceedings, and I would ask that the Court -- I made the request previously. Judge Winn did deny, basically, because it was a subsequent -- a subsequent request under 1368. I have researched and I found language of – apparently the D.A. had filed the document the last hearing in which he cited three cases about that the burden would be on the defense which shows substantial change of circumstances or new evidence casting serious doubt of the validity of a prior finding on the defendant's competence. So if you want me to address that.

> THE COURT: If you like.

> [DEFENSE COUNSEL]: The cases that they cited in People versus Jones, for example, there have been -basically, there's no -- nothing was offered other than -- nothing new was offered other than the – that the attorney felt that the defendant was unable to cooperate with the attorneys, and that was pretty much it. And there they actually -- the defendant had actually gone through an entire trial and -- with the defendant -- had observed the defendant had actually participated, so felt that the conditions were such that it had not changed from the start of the trial, which is the first competency hearing, apparently.

> And so I think there's a -- People versus Medina is a very similar thing. In that case it actually had been a full-fledged competency hearing at which the individual was eventually found competent. And there no second hearings requested until about ten months later. And the offer had been -- what was offered was his client was not communicating with him, but there was no new evidence presented, nothing additional than noncooperation.

> And People versus Kelly, another case, there, there were apparently three reports that had come back that all agreed that the individual was competent during the first request, and it was submitted on those three reports. And then when a second request was made all the defense attorney did was allege the same facts that had been in support of the first request.

> So that, again, all three of those, there was nothing additional that had occurred; that there were no intervening events or any other information forthcoming.

16

In Mr. Gray's situation we have the original finding of the report which was submitted by Dr. Schaffer. And it was submitted. And I understand that in the case that I have very little latitude to argue against it at this point, but that's what it was, and it was submitted in a single report.

But I would say that since then, additional information, information that Dr. Schaffer did not have available, I did not have available, but did come forth several months later and was evaluated, reviewed very carefully by Dr. Wicks, and some of it was also reviewed by Dr. Mattiuzzi during a review for whether -- on the Court's request on whether Mr. Gray should be allowed to represent himself, indicated additional, I think far more information, far more in-depth testing; the-history of my client was validated; furthermore, several of the tools used by Dr. Wicks, apparently, countered or contradicted Dr. Schaffer's finding of possible malingering by my client.

Finally, there was the, as I mentioned, I believe in chambers, there was a referral to Dr. Globus, who is a neuropsychiatrist, an M.D., to determine whether a brain PET scan would be -- would be called for, would be helpful, would be, in terms of giving us what we call hard science versus the soft science testing. And Dr. Globus, in fact, met with Mr. Gray; did evaluate him, and then referred him for the PET scan, which was then done in November. And the report, discussed with counsel in December, and indicating that my client had apparently my understanding there were three lobes of Mr. Gray's brain that appeared to be abnormal, and that they did do some technical findings of various parts and what they observed from moderate to mild, the overall impression, according to the radiologist, was that Mr. Gray presents as a -- very similar to an Alzheimer's patient, which would be very unusual for somebody with that, at the time of his testing, he was 22 years old.

But -- and Dr. Globus, in his report, as I indicated before we went on the record, had submitted a written report. I have been told there was a final one coming, but it just involved some minor changes, but that his conclusion doesn't -- doesn't change, which basically, says that the PET scan supports the finding of the neuropsychologist.

The PET scan allows one to view by anatomical indications and reduced nerve function. This test is used to determine dementia. Although Oliver is young, he showed extensive findings of brain damage which are consistent with the neuropsychological testing.

There are four lobes of the brain which are impaired. They are frontal, which is the area of the brain associated with secondary functioning and personality; temporal, which is associated with memory, pleasure, sexuality, and aggressivity; parietal, which is associated with language functions in association with visual, auditory, and somatosensory functions, and the occipital which is associated with visual perception.

Oliver Gray shows reduced level of brain functioning in the anterior part of the temporal lobes toward midline, bilaterally symmetrical dysfunction in the parietal lobes, and more subtle decreased activity

in both of the frontal lobes.

In summary, the pattern of brain damage in Oliver Gray is growing similar to findings in Alzheimer's disease in severity and extent.

These findings are consistent with the results of my psychiatric examination and Dr. Wicks' neuropsychological examination. His level of thinking and perception is so impaired as to affect day-to-day social functions, and would also impair his understanding of the consequences of the behaviors he displayed during and shortly after the alleged offense.

These functions are so impaired that his behavior cannot be rationally adjudged in the manner you adjudge someone's freedom with this brain damage.

THE COURT: Isn't part of the difficulty, though, with at least the information you were just providing to the Court that when one speaks of Alzheimer's there's a range. And all we have, at least in terms of doctor's statement, is a reference to Alzheimer's generally.

In addition, your report talks about consequences. We're not necessarily talking about consequences here. We're talking about purpose. Did Mr. Gray understand what he was doing in the context of did he have a specific purpose when he did what he did. And it's not so much a consequence of the actions; it's did he understand what he was doing.

[DEFENSE COUNSEL]: And I appreciate that, and I don't think the doctor meant consequences in the system, talking about legal consequences. But as far as my request that he be evaluated under 1368 with more focus on this aspect of competency, whether you know, whether -- what I -- I am not an expert in the mental health, and so I rely on who we turn to; who we use regularly; who do I believe have good reputations. My understanding is that, although we talked about developmentally disabled has been used as a code word for something else, that is -- that is mental retardation; that that is such a highly charged word it's no longer considered that. It's considered something that can actually encompass more than something like a low I.Q., which I think is what we're dealing with here.

The testing indicates overall that Oliver is in the normal range. But there are certain -- there are still certain aspects of -- or the categories that were tested which actually are well below normal, and those would be the ones that are affected, not just as far as his defense in trial, but certainly as far as his ability to process what is going on during the trial, to be of assistance -- I mean my primary concern is whether he's going to understand what is going on through trial and whether we're going to be stopping every hour, every hour and a half so I can spend half an hour explaining to him what happened. I'm not saying I won't do that. I'm just saying I don't think that's -- I don't think there will be a net gain there.

In any event, I think that because - -

18

THE COURT: Let me interrupt you. Can I also assume from that that in such a situation it's somewhat difficult for your client to assist you in his defense?

(1 RT 53-59.)  Defense counsel agreed.  (1 RT 59.)  The court then heard from the prosecutor.  (1 RT 59-60.)  When the court asked defense counsel if she was asking the court to revisit a prior judge's competency ruling, defense counsel replied affirmatively.  (1 RT 61.)  When the court pointed out there was "nothing new" (1 RT 61), defense counsel argued to the contrary:

[DEFENSE COUNSEL]: Well, yes, the new thing would be the time together, what it means, if the PET scan, as far as affirming Dr-. Wicks' report, and also showing the level -- the level of impairment and how it affects my client.

But additionally, I think what -- I can take it up on a writ if the Court I can take it up on a writ, because my view of it was in some ways the proof might be in the pudding. When we get to court let's see what happens -- how my client operates; how he behaves; how he's able to function. And, quite frankly, you know, so far I am increasingly concerned. And I think that it's not going to get -- I think the fact that we started at a slow start without a lot of, you know fairly, you know, not a -- even though it's formal it's not overwhelming. And it's starting with him not sleeping; it's starting with him -- having a call from him yesterday trying to find out what was happening. We came back after lunch yesterday, and basically said, "Can we start over? Maybe I'll understand if we start over.

Sort of beyond that -- I don't -- I think that's pretty I think that's a very good illustration, I think, of what we can be looking forward to. And it's not to take anything away from Judge Winn. I think he had to -- he had to make a judgment call. And, you know, that was -- he thought that Dr. Wicks presented a close, you know, a fairly close question.

And the other thing that Judge Winn relied on is actually improper, and case law says this, he relied on conversation he had with my client several months prior. And that's not appropriate.

So that's why I'm asking this court, having sat and watched my client, and then taking into consideration the information that I can provide.

THE COURT: Well, I think I'm taking in the same information as Judge Winn heard. So I do think in the end [the prosecutor] has a valid point; that what you're asking this court to do is to revisit, in a sense, the exact material presented to Judge Winn and simply to render a different opinion with regard to competency.

The only thing that might be different is the PET scan material. But it sounds like that also may have been provided to Judge Winn. And then with regard to the PET scan material I haven't seen anything. I

19

have just simply had the information read into the record that you read. And I'm not quite sure what it means.

And so I'm in a situation where there is some material with regard to PET scans that were done, and they showed some abnormalities, and I'm using that word loosely; that one might say are similar to a patient with Alzheimer's. But as we started this conversation, Alzheimer's can be minor to severe. And I don't know where your client may or may not fit, and whether or not I should accept the assumption that it's similar to. So there's a whole host of issues there.

And that sounds like it may be, and I'm not sure whether Judge Winn heard that or not, but that may be the only difference that may have existed between what Judge Winn heard and what I am hearing today. And I'm not quite sure how that is different. It doesn't mean anything in the context in any kind of context.

[DEFENSE COUNSEL]: As well as the Court's own observation of my client's conduct during a very short period of time that he was in court.

THE COURT: He seemed disengaged yesterday. But I'm not sure disengaged means incompetence. They're quite different.

[DEFENSE COUNSEL]: If he's not able to understand what is going on and assist in his defense should I just keep raising it after every court session and bring up more facts that - -

THE COURT: Yes.

[DEFEENSE COUNSEL]: Okay.

THE COURT: I don't have a problem with that. If, in fact, you think your client is not able to assist you in his defense - -

[DEFENSE COUNSEL]: That's fine.

THE COURT: - - then we have an issue and we have to address it. I'm not precluding you from doing that. I'm simply not going to take the position that without additional information that this court is going to overrule the determination that was made by Judge Winn. It doesn't sound like there's anything of any significance that is different. Because it sounds like Judge Winn may have also had the PET scan available to him.

[DEFENSE COUNSEL]: He did not have the report, which I did leave with the Court yesterday.

THE COURT: I don't have the report as well.

[DEFENSE COUNSEL]: I left with the Court yesterday.

THE COURT: Well, I have two reports. Maybe this is the one you are talking about. I have one from Dr. Wicks. And then I have a three-page - -

[DEFENSE COUNSEL]: Yes.

THE COURT: -- I don't want to call it a report. It's, essentially, imaging results.

[DEFENSE COUNSEL]: It's the findings. That is the only report that the neuroradiologist provided.

THE COURT: But the difficulty with -- and is this Dr. Globus' or somebody else?

[DEFENSE COUNSEL]: No, that's Dr. Hagge.

THE COURT: The only thing this has is under the heading "Impression" it talks about bilaterally symmetric pattern of decreased F.D.G. activity, most severe in the anterior temporal lobes. Moderately decreased, bilaterally symmetric F.D.G. activity in the posterior superior parietal lobes. Small, subtle, symmetric regions of mildly decreased activity paramedian anterior pole of bilateral frontal lobes of questionable significance. And an overall pattern is most suggestive of Alzheimer's, but this would be unusual, or very unusual diagnosis in a 22-year-old.

I don't know what that means. When I hear all of that all it tells me is that there's something different about the brain activity of your client as compared to what the doctor normally would see on the imaging. But what that means in terms of competency, that's a connection I don't see or find anywhere in the report.

[DEFENSE COUNSEL]: Correct. And taken in conjunction with Dr. Wicks' report, however, I think that there's sufficient showing that my client is, indeed, neurologically impaired and moderately -- actually, in some areas moderately to severely impaired. And so taken in light of that, and in light of his conduct, his communications, and I can't say it any plainer than what I have, is that I have a doubt that he will be able to understand what is happening; what has happened; what will happen during this trial, and that he will not be able to assist in his defense. And that's all I can do. Frankly, under the law that should be sufficient. And I brought additional information.

And the fact that Judge Winn on, you know, basically, a very busy calendar day in department 61 made the decision he made, again, I don't mean to belittle it, I'm simply saying that I believe my client has not shown, or I believe my client -- my client's functioning while in court does not -- is not contradicting my earlier impression when I was in front of Judge Winn.

THE COURT: The reports also indicate, however, that your client's functioning in court seems to be at odds with his functioning on numerous occasions outside of court. And although Dr. Schaffer may at least have made some references to malingering, at least when I also see references to the interaction with jail staff, the interactions outside of custody status, I'm not seeing quite the same thing that I'm seeing in court in terms of the reports that. I'm reading. Any

21

comments on that?

[DEFENSE COUNSEL]: Because I think that this is a much more formal -- those will be areas that I think spaces, places that my client may feel more comfortable, more secure. You know, he has a memory. He knows how to -- he knows certain ways to behave as he's grown older.

I mean the fact that the police reports from several years ago may report or reflect certain conduct, frankly, some of that is still consistent. It is very much consistent with what we believe to be a longstanding neurological impairment -- the outbursts, behavioral aggression, things like that. But as far as just being able to get from point A to point B, from the jail to the courtroom, and to function with medical staff, he's grown a little bit more trusting of that. Although, quite frankly, when he first met with Dr. Schaffer that was not -- that was not the situation.

But because of his continued interaction with mental health professionals I believe that that – that that's -- that has changed. And because, again, because he's become more accustomed and more used to it. And he can -- when he's not -- when he's in a good space he can accept that that's -- that they're not there to harm him.

But, you know, as far as how he's going to function here, you know, if the Court is not ready yet, is not inclined to find that the way he acted yesterday or conducted himself, and on top of all of this other information is sufficient, obviously, I will have to accept that.

THE COURT: The Court is not prepared to declare a doubt at this point.

(1 RT 61-68.)

Here, the state trial court followed the state-created procedure for ascertaining whether it had doubt as to petitioner's competence under the California Penal Code where the court previously found petitioner to be competent.[3]

"Once a defendant has been found competent to stand trial, a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence. [Citations.]" (*People v. Medina* (1995) 11 Cal.4th 694, 734 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

---

[3] California Penal Code section 1367(a) reads: "A person cannot be tried or adjudged to punishment . . . while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

1    People v. Weaver, 26 Cal.4th 876, 954 (2001).

2        The state appellate court determined that the applicable statute calls for a duty to suspend

3    proceedings and conduct a second or subsequent competency hearing requires a substantial

4    change or new evidence casting serious doubt on the prior competency hearing.  It further held

5    that the duty does not depend on the basis asserted for the purported incompetence to stand trial.

6    Rather, the statute requires a thorough inquiry into a defendant's competency to stand trial, not

7    into the basis upon which the asserted competency relies.  The state court's interpretation binds

8    this court.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of

9    state law, including one announced on direct appeal of the challenged conviction, binds a federal

10   court sitting in habeas corpus").

11       In any event, the state appellate court's determination that, where there has been a prior

12   competency finding, the process does not begin anew depending upon the basis asserted for the

13   purported incompetency, is neither unreasonable nor contrary to Supreme Court authority.

14       As the record reveals, there was no substantial change or new evidence casting serious

15   doubt on the prior competency finding.  Defense counsel's comments, argument notwithstanding,

16   support the state court findings.

17       More particularly, during the argument excerpted above, defense counsel characterized

18   the PET scan as "validat[ing]" her client's "history," which counsel referred to as a "longstanding

19   neurological impairment," a history previously considered by the trial court as a part of Wicks'

20   report.  Defense counsel characterized the PET scan and Dr. Wicks' report[4] as "hard science

21   versus soft science testing," and the PET scan as "affirming Dr. Wicks."  It was not unreasonable

22   for the state court to conclude the required showing – a substantial change in circumstances or

23   new evidence casting serious doubt on the validity of the prior finding – was not made.

24       The undersigned has reviewed the entire record carefully, including those portions

25   highlighted by petitioner in his reply to respondent's answer in support of his claim.  (ECF No. 47

26

27   _____

     [4] Notably, Dr. Wicks was not asked to assess petitioner's competency.  (See Supp RT at 15.)
     Additionally, back in 2013, during argument to Judge Winn, defense counsel referenced the PET

28   scan findings.  (Supp RT 15-16.)

at 7-10.) The excerpted portions cited by petitioner do not serve to make the state court's determination unreasonable or contrary to Supreme Court precedent.

The state appellate court's determination that the trial court did not err in refusing to suspend the proceedings and conduct a second hearing on petitioner's competence to stand trial following defense counsel's request and submission of PET scan findings was not unreasonable, nor was it contrary to Supreme Court precedent. 28 U.S.C. § 2254(d); Mendez v. Knowles, 556 F.3d at 771. Therefore, the undersigned recommends petitioner's claim be denied.

B.      *Juror Competency*

Petitioner claims that the trial court violated his due process rights and right to a fair trial when it failed to conduct an inquiry into a juror's ability to comprehend jury instructions. (ECF No. 18 at 33-38 & ECF No. 47 at 10-14.) Respondent maintains the state appellate court's determination of the claim was neither unreasonable nor contrary to Supreme Court precedent, and as a result, petitioner's claim must be denied. (ECF No. 44 at 24-26.)

The last reasoned rejection of petitioner's claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court addressed this claim as follows:

*Juror Competence*

Defendant next contends the trial court erred in failing to conduct any inquiry after the jury foreperson reported that one of the jurors did not understand the reasonable doubt instruction. Again, we disagree.

"If at any time ... a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, ... the court may order the juror to be discharged...." (Pen.Code, § 1089.) "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.) "However, "'not every incident involving a juror's conduct requires or warrants further investigation. 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.'" [Citation.] "'[A] hearing is required only where the court possesses

24

information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.'"" (*People v. Cowan* (2010) 50 Cal.4th 401, 506.) Where the trial court "reasonably could have concluded that there were no grounds for believing good cause to excuse [a juror] might exist," it is not an abuse of discretion for the court to decline to hold a hearing or conduct a further inquiry. (*Id.* at pp. 507–508.)

Here, defendant suggests the trial court abused its discretion by not conducting a further inquiry because the court was "presented with evidence that a juror m[ight] be unable to deliberate." Not so. In fact, the jury foreperson told the court that the juror in question was, in fact, "participating" in deliberations.

To the extent defendant's argument rests on the concern that, although able to deliberate, the juror in question might have been unable to comprehend the jury instructions, the statements by the jury foreperson were ambiguous as to what the problem actually was, and under the circumstances it was reasonable for the trial court to conclude that the problem was not, in fact, with the juror's ability to comprehend the jury instructions and thus perform her duties but was, instead, reflective of a disagreement over what constituted reasonable doubt. At first, the jury foreperson expressed concern with the juror's "literacy level." Ultimately, however, the court ascertained that the instructions had been read to the juror; thus, the juror's ability to read was not really the issue. And while the foreperson generally expressed doubt about whether the juror had "the comprehension to be able to read the instructions as given to her," the foreperson's only specific concern was about the juror's ability "to comprehend what 'reasonable' means and what 'beyond a reasonable doubt' means." Under these circumstances, it was not unreasonable for the trial court to conclude that the real problem was not with the juror's ability to read or with her ability to comprehend the instructions generally, but rather the problem lay in a disagreement among the jurors over what constituted reasonable doubt under the facts of the case.

Because, under these circumstances, the trial court reasonably could have concluded that there were no grounds for believing good cause to excuse the juror might exist, the trial court did not abuse its discretion in refusing to hold a hearing or conduct a further inquiry.

(LD 2 at 4-6.)

////

25

Applicable Legal Standards

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to a trial by a fair and impartial jury.  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  The right to a jury trial is extended to state criminal trials through the Due Process Clause of the Fourteenth Amendment.  Duncan v. Louisiana, 391 U.S. 145, 148-149 (1968) (holding that "the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee").  A defendant in a criminal case is also entitled to a jury that reaches a verdict on the basis of evidence produced at trial. Turner v. Louisiana, 379 U.S. 466, 472 (1965); Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2004).

In California, discharge of jurors for cause is governed by California Penal Code section 1089, which provides that a trial court may discharge a juror who "becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor."  The Ninth Circuit has upheld California's procedure for discharging and replacing jurors as facially constitutional.  Miller v. Stagner, 757 F.2d 988, 995 (9th Cir. 1985) ("The California substitution procedure followed by the trial court preserved the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments" [internal citations omitted]); see also Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir. 1997).  In circumstances where a juror is challenged for cause, the trial court has "considerable discretion in determining whether to hold an investigative hearing on allegations of juror misconduct and in defining its nature."  United States. v. Barrett, 703 F.2d 1076, 1083 (9th Cir. 1983).  Indeed, the Ninth Circuit has held that clearly established federal law does not require state or federal courts to hold an evidentiary hearing every time a claim of juror misconduct or bias is raised.  Tracy v. Palmateer, 341 F.3d 1037, 1042-45 (9th Cir. 2003).

Analysis

The undersigned begins by excerpting the relevant proceedings at issue:

> THE COURT:  Before you begin, I don't want you to tell me
> anything about the deliberations themselves.  But the bailiff has
> reported to me that you had some concern that you wish to raise

before me.

JUROR NO. 9:  Yes.  [¶]  Thank you for telling me that, first off.

My concern is with what a juror's literacy level is.  We have a juror who I do not believe has the comprehension to be able to read the instructions as given to her.  I'm concerned, because we have tried to explain in different modes and modalities.  I teach special needs students, and I have tried numerous ways to see if we can get her to comprehend what "reasonable" means and what "beyond a reasonable doubt" means, and it's been stalling us.

THE COURT:  Is she participating?

JUROR NO. 9:  She is participating.  [¶]  I have seen some evidence that she has limited literacy.  Her handwriting is sporadic.  It's hard to read.  I am just telling you observations.

THE COURT:  Have you read the instructions out loud to her?

JUROR NO. 9:  We have.  And had her read them, but it did not seem to help.

THE COURT:  Okay, there may not be anything I can do to help you on that.  In some situations, people - - if she is hearing the instructions, even if she can't read them, then it may be simply a difference of opinion.

JUROR NO. 9:  Okay.

THE COURT:  All right.  [¶]  Do counsel have any questions they wish to raise?

[PROSECUTOR]: Yes.  [¶]  Does it appear that she is understanding the instructions?

JUROR NO. 9:  It does not appear she is understanding the instructions.

[PROSECUTOR]:  The instructions have been read.  [¶]  What is it that indicates to you that she does not understand the - -

THE COURT:  I don't want you to answer that.  That is going into deliberations.  You cannot talk about the deliberations.

[Juror No. 9] has informed us that, in fact, there is an issue with regard to perceived comprehension, but the instructions have been read aloud.  Now we have a situation in which a juror has not reached a similar conclusion, potentially, as others.

JUROR NO. 9:  I am the foreperson, so the instructions have been read.  They have pointed out to her - - we had multiple people read them.  I have read them slowly enough.  Even had her track with her finger along with the text.

How would you like us to proceed? How would you like me to proceed?

THE COURT: I cannot answer that for you, is the problem, because it sounds like you are doing everything that the Court would request you to do. You have read the instructions aloud. Like you said, you focused on different aspects of the instructions. And individuals have varying interpretations at times, based on the facts as they have determined them through the process of the trial.

So at this point in time, I am simply going to have you return to deliberations and continue those deliberations.

JUROR NO. 9: Okay.

THE COURT: All right.

JUROR NO. 9: Thank you.

THE COURT: Counsel, any comments?

[PROSECUTOR]: Yes, Your Honor. [¶] I would not say it is a difference of opinion. It sounds like the juror does not understand the instruction itself, or the juror cannot understand the instructions. There is no way for that jury to - -

THE COURT: How would the Court ever make a determination without intruding completely into deliberations?

What you have is, it appears, a factual determination, and it all boils around what is reasonable and what is not reasonable. And it sounds like substantial jurors have reached a determination of facts of what is reasonable and that this juror does not believe that, in fact, that interpretation is reasonable.

How would the Court ever make such a determination?

[PROSECUTOR]: I think you could have the juror that is - - who is apparently not understanding the instruction - - ask them if they understand. You simply ask the juror: Do you understand the instruction as I read them to you? You don't have to ask them about their opinion.

THE COURT: Let's assume I do that and they say, Yes, I understand them? Or let's assume I do that and they say, No, I don't understand them. What do I do?

[PROSECUTOR]: If a juror cannot understand and comprehend the law as given to them, I think we have to replace that juror with an alternate.

[THE COURT]: But that's not what I was hearing. What I heard is that there was a difference with regard to - - as to what a reasonable doubt is. At the very heart of every jury trial - - that is what [Juror No. 9] talked about - - she was having trouble understanding what

28

reasonable doubt is.

What you are asking me to do is make a determination for the jurors as to what reasonable doubt is.

[PROSECUTOR]: That is not what I am asking. I am simply asking that we confirm with the juror that they do, in fact, understand the instruction as it was read to them.

THE COURT: How do I do that with reasonable doubt if that is the issue, which it appears to be?

[PROSECUTOR]: I don't think we have to ask them about the content, simply, do you understand the words I'm telling you? Yes or no.

THE COURT: Well, we will see where we go. I'm not sure how - - basically, from what [Juror No. 9] indicated, the issue is over reasonable doubt.

And even if the juror says, no, I don't understand what reasonable doubt is, what would you have me tell the juror then?

[PROSECUTOR]: I think that's different. The way - - she made it sound like the person doesn't understand the instruction at all because of their inability to apparently read and write. She talked about it in the context of literacy issue. If the person says, I don't understand what reasonable doubt is, you simply give them the instruction. That's it.

But if they don't understand, they can't comprehend it - - the entire instruction or any of the instructions - - I think that's the issue. That's the distinction I'm asking the Court to make, is find out if the person can comprehend the instructions. We don't have to use reasonable doubt. We can ask about a different instruction. Can they comprehend the instructions? Or is it simply that they don't get something, in which case we just give them the instruction again.

[THE COURT]: Well, let's wait and see. They'll get back to us at some point today.

But this is an area where one treads gingerly. The bottom line here is that I don't want to influence their deliberations. I don't want to put a particular juror on the spot - - which is what could ultimately happen - - at least at this stage in the proceedings. So let's wait.

Any other comments?

[PROSECUTOR]: No, Your Honor.

[DEFENSE COUNSEL]: My client is here. [¶] I want to put on the record any of the communications thus far and the responses - - the jury - - any of the jury communications thus far and the responses, what's been read back. Just wondered if the Court wanted to put that on the record.

THE COURT:  I don't.  There's no need.  It's on the record.

(4 RT 941-47.)

California Penal Code section 1089 provides, in relevant part:

> If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors.

Here, the California Court of Appeal determined that the trial court conducted an adequate investigation with regard to juror in question's ability to discharge her duties as a juror.  The Court of Appeals finding is reasonably supported by this record, and thus is presumed correct. Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004).

This record reveals the trial court exercised its discretion with care.  See People v. Barnwell, 41 Cal.4th 1038, 1052 (2007); People v. Salinas-Jacobo, 33 Cal.App.5th 760, 776 (2019) ("'whether to discharge a juror because of the juror's conduct during deliberation is a delicate matter'"), citing People v. Cleveland, 25 Cal.4th 466, 484 (2001).  The trial court relied upon the foreperson's responses to questions to reasonably conclude the issue was not the juror's "literacy level" (4 RT 941), as originally described by the jury foreperson, but rather the juror's application of the term "reasonable" and "reasonable doubt" to the facts and evidence during deliberations.  The jury foreperson acknowledged the juror at issue was participating in deliberations (4 RT 942) and that the instructions had been read aloud during deliberations on more than one occasion (4 RT 942-43).

When the juror foreperson reported that she believed the juror at issue did not have "the comprehension to be able to read the instructions as given" (4 RT 941), continuing that she and the other jurors were trying "numerous ways to see if we can get her to comprehend what 'reasonable' means and what 'beyond a reasonable doubt means,'" the trial court's first question was whether the juror was participating (4 RT 942).  When the foreperson replied affirmatively and added that she had "seen some evidence that [the juror at issue] has limited literacy" and that

30

her "handwriting was sporadic" and "hard to read" (4 RT 942), the court clarified that the instructions had been read aloud and then stated "even if she can't read them, then it may be simply a difference of opinion." (4 RT 942.) The undersigned notes the trial judge's interpretation of the foreperson's report is reasonable – the foreperson indicated the other jurors were trying to "get" the juror at issue to "comprehend" the meaning of "reasonable" and "reasonable doubt" – certainly that could reasonably be heard to signal a disagreement concerning the application of the law to the facts. After the jury foreperson was excused and returned to the deliberation room, the trial court further explained its concern in this regard when the prosecutor expressed a desire to question the juror at issue as to competency. (4 RT 944:13-18 & 945:3-8.)

A deliberating juror should not be discharged for failing to agree with the majority of other deliberating jurors. People v. Armstrong, 1 Cal.5th 432, 452 (2016); People v. Salinas-Jacobo, 33 Cal.5th at 777. On this record, the jury foreperson's comments could be reasonably understood to be that the juror in question did not "'deliberate well or uses faulty logic or analysis,'" which is an invalid reason for discharging a participating juror. Armstrong, 1 Cal.5th at 452, citing Cleveland, 25 Cal.4th at 485.

The undersigned disagrees with petitioner that the state court's finding is unreasonable because the record here amounts to demonstrable reality that the juror in question was unable to perform her duties.

When the state appellate court held "it was not unreasonable for the trial court to conclude that the real problem was not with the juror's ability to read or with her ability to comprehend the instructions generally, but rather the problem lay in a disagreement among the jurors over what constituted reasonable doubt under the facts of the case," the finding was not so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Richter, 562 U.S. at 103.

In sum, the state appellate court's determination of petitioner's claim was not contrary to, nor did it involve an unreasonable application of, Supreme Court precedent. 28 U.S.C. § 2254(d). Therefore, the undersigned recommends the claim be denied.

////

C.      *Exculpatory Evidence & Related Ineffective Assistance of Counsel Claims*

In ground three, petitioner contends the prosecutor withheld exculpatory evidence in violation of his due process and equal protection rights.  (ECF No. 18 at 38-39.)  In ground four, petitioner contends trial provided ineffective assistance of counsel by failing to investigate and discover the prosecution's suppression of evidence.  (Id. at 39-41.)  In ground five, petitioner asserts appellate counsel was ineffective for failing to raise the prosecution's suppression of evidence.  (Id. at 41-43.)  And, in ground six, petitioner contends that appellate counsel was ineffective for not raising trial counsel's failure to investigate and discover the prosecutor's suppression of evidence.  (Id. at 43-44.)  Because the claims are related, grounds three, four, five and six will be addressed together by the undersigned.

Respondent counters that the state court's conclusion that petitioner failed to establish prejudice as to the Brady claim was reasonable.  (ECF No. 44 at 26-28 [ground 3].)  Further, respondent argues the state court's determinations that neither trial counsel nor appellate counsel rendered ineffective assistance of counsel were reasonable because petitioner could not establish prejudice.  (Id. at 29-31 [grounds 4-6].)

These claims were raised in habeas proceedings before the state courts.  (LD 9, 11, 13 & 15.)  The Sacramento County Superior Court denied petitioner's claim in a reasoned decision filed November 6, 2015:

> The State Court Determination
>
> Petitioner first claims that he was denied due process and equal protection, by the prosecution's suppression of its knowledge of the existence of percipient witness Quang Hua, who could have given exculpatory testimony on petitioner's behalf, and that he is entitled to relief under Brady v. Maryland (1963) 373 U.S. 83.  Petitioner claims that after trial, he discovered a document generated by the investigative branch of the Sacramento County District Attorney's office, obtained by prosecutor Brad Ng and prepared by "Beardsly," dated February 6, 2013, stating that Beardsly had received a request from Ng to contact Qua Hua, who might be a victim/witness in a case; that Beardsly contacted Hua and made arrangements to meet with Hua; that Beardsly met with Hua on February 6, 2013, at which time Hua told him that Hua was at the McDonald's on Power Inn/Fruitridge [sic] at 8:00 a.m. and was standing in line, that two subjects entered with their faces partially covered, that they yelled for everyone to lie down on the ground, that one was taller than the other, that the taller was pointing a handgun at them,

that Hua was not sure if the other had a gun, the shorter one jumped over the counter and ran towards the employee working the drive-through window, the taller remained where Hua was lying then walked behind the counter, that Hua heard the taller one yell at the employee to open the register or he would shoot, that Hua saw the subject go through the register and heard the subject scooping out the change drawer, that a few seconds later the subject approached Hua and Hua felt the barrel of the gun pressed against his back, the subject reached into Hua's pocket and tried to remove Hua's wallet but could not get it out, that the other yelled out that someone was calling 911 and they had to leave, that both ran out of the east doors, that after that, Hua got up and saw them run southbound on Power Inn and then westbound onto a street one block away; that Hua described the first suspect, who had tried to steal his wallet, as a black male, 6', 200 lbs., muscular, dark colored baseball hat, unknown colored short-sleeved t-shirt, dark colored jeans; that Hua described the second suspect as a shorter and heavier black male, possibly wearing a baseball hat, white short sleeved t-shirt, and dark-colored jeans; that Hua said both suspects had their faces covered possibly with a bandanna and that Hua could only see the bridge of their noses and their eyes; that Hua said the first suspect had a dark colored gun. Petitioner attaches a copy of the report as Exhibit A to the petition. Petitioner claims that suppression of this witness was material to his case, because the case was premised in large part upon identification testimony that one suspect was white and the other was black. Petitioner claims that presenting Hua's testimony could have bolstered petitioner's version of the facts that there was a "J" person at the scene during the commission of the crime. Petitioner also claims that trial counsel was ineffective in failing to investigate and discover this evidence and to present it at trial, and that appellate counsel was ineffective in failing to raise the issue on appeal.

Petitioner fails to show prejudice. Although petitioner is white, petitioner admits that the testimony that was presented was that one suspect was white and the other black; the suspects were seen getting away in a green minivan and an officer followed them; by the time the officer got to the van, no one was inside; neighbors told the officer that the two suspects had fled the van and hopped a fence heading east; the police set up a perimeter; a resident in the area was confronted by petitioner who asked to use her phone; the resident saw him with a light skinned black male and called police, and upon police arrival pointed to where they were headed and said petitioner was wearing her son's Ecko shirt; the officer saw both suspects heading south on foot and saw petitioner drop a black t-shirt on the ground and that petitioner had a gun in his hand; the officer detained the other suspect but not petitioner and radioed for backup; officer Peirsol responded, saw petitioner in the area, and got petitioner to drop his gun; Peirsol saw petitioner drop cash and coins from his pocket; petitioner was not wearing a shirt when captured; petitioner was put in the back of the patrol car and made an apparently spontaneous statement outside of Peirsol's presence, described more fully below, that he had "robbed them mother__kers" for his family; a witness identified the van that was found, and a .38 revolver, rubber gloves, loose cash, one of the robbery victim's purse stuffed with money of various denominations, a gray sweatshirt, and a robbery

alarm monitor were found inside the van; one robbery victim identified petitioner as being similar in height to the person who robbed her and that he was wearing baggy clothing; another robbery victim identified petitioner as matching the white suspect's height, weight, and skin tone and as wearing the gray sweatshirt found in the van, and also recognized the .38 revolver; another robbery victim identified petitioner as being similar to the white suspect in height and skin tone, and that petitioner was wearing similar shoes to that suspect; the petitioner dropped money while fleeing; he also dropped a note written by one of the restaurant managers; and, at petitioner's bail hearing he stated, "I can't deny the allegations are true."

After a review of petitioner's recitation of the evidence presented at trial that petitioner set forth in the habeas petition, discussed in the paragraph above, it is clear beyond a reasonable doubt that petitioner was one of the two robbers at the restaurant, and that any testimony that might have been presented by witness Hua that both suspects were black, rather than that one was black and one was white, would not have been reasonably likely to have made a difference in the outcome of the trial. Petitioner was identified by several witnesses as being similar in height, weight, and skin tone to the white suspect they had seen, and petitioner does not present any evidence to show that Hua had ever been shown petitioner or petitioner's photograph and stated that petitioner was not one of the two suspects. As the faces of the perpetrators were covered except for the eyes and bridge of the noses, race could have been easily mistaken. More tellingly, petitioner himself admitted the crime while in the back of the patrol car, speaking in an apparently spontaneous manner, as discussed below, that he had robbed people and had done it for his family. That, coupled with the chase that resulted in his dropping not only a gun but money that was probably stolen, as well as a note written by the manager of the restaurant about that day's earnings, point conclusively to his guilt. As such, there is no prejudice, and the claim is denied.

(LD 10 at 1-3.)

The Applicable Legal Standards

In Brady v. Maryland, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The duty to disclose such evidence is applicable even though there has been no request by the accused. United States v. Agurs, 427 U.S. 97, 107 (1976). The duty encompasses impeachment evidence in addition to exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). A Brady violation may also occur when the government fails to turn over evidence that is "known only to police investigators and not to the

34

prosecutor." <u>Youngblood v. West Virginia</u>, 547 U.S. 867, 870 (2006) (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 437, 438 (1995) ["the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"]).

As stated in <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999), three components are required to establish a <u>Brady</u> violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>See also</u> <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004); <u>Silva v. Brown</u>, 416 F.3d 980, 985 (9th Cir. 2005). "The prosecutor, although 'not required to deliver his entire file to defense counsel,' is required to turn over evidence that is both favorable to the defendant and material to the case." <u>Amado v. Gonzalez</u>, 758 F.3d 1119, 1134 (9th Cir. 2014) (quoting <u>Bagley</u>, 473 U.S. at 675).

A defendant is prejudiced by a <u>Brady</u> violation if the evidence that was not produced is material. <u>Amado v. Gonzalez</u>, 758 F.3d at 1134. Evidence is material if "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." <u>Strickler</u>, 527 U.S. at 289. "The question is not whether petitioner would more likely than not have received a different verdict with the evidence, but whether 'in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Id.</u> (quoting <u>Kyles</u>, 514 U.S. at 434); <u>see also</u> <u>Silva</u>, 416 F.3d at 986. Once the materiality of the suppressed evidence is established, no further harmless error analysis is required. <u>Kyles</u>, 514 U.S. at 435-36; <u>Silva</u>, 416 F.3d at 986. "When the government has suppressed material evidence favorable to the defendant, the conviction must be set aside." <u>Silva</u>, 416 F.3d at 986.

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his trial counsel's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 694 (1984).

Under the first prong of the <u>Strickland</u> test, a petitioner must show that counsel's conduct

35

failed to meet an objective standard of reasonableness. Strickland, 466 U.S. at 687. There is "a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington v. Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 689). Petitioner must rebut this presumption by demonstrating that his counsel's performance was unreasonable under prevailing professional norms and was not the product of "sound trial strategy." Strickland, 466 U.S. at 688-89. Judicial scrutiny of defense counsel's performance is "highly deferential," and thus the court must evaluate counsel's conduct from her perspective at the time it occurred, without the benefit of hindsight. Id. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690.

The second prong of the Strickland test requires a petitioner to show that counsel's conduct prejudiced him. Strickland, 466 U.S. at 691-92. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." Id. at 693. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 693). "The likelihood of a different result must be substantial, not just conceivable." Id.

A habeas claim alleging appellate counsel was ineffective is evaluated under Strickland. See Williams v. Taylor, 529 U.S. at 390-91. As the high court has observed, appellate counsel performs properly and competently when he or she exercises discretion and presents only the strongest claims instead of every conceivable claim. Jones v. Barnes, 463 U.S. 745, 752 (1983); Smith v. Murray, 477 U.S. 527, 536 (1986). "In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy." Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989). The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable.

1 | Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998). Even if petitioner could demonstrate

2 | his appellate attorney acted unreasonably, he must still show prejudice. Smith v. Robbins, 528

3 | U.S. 259, 285-286 (2000). Habeas relief for ineffective assistance of counsel may only be

4 | granted if the state-court decision unreasonably applied the Strickland standard. Knowles v.

5 | Mirzayance, 556 U.S. at 122.

6 |             Analysis

7 |      To begin, although the undersigned tends to agree with respondent that petitioner has

8 | failed to establish the factual basis of his claim – that the prosecution withheld the evidence at

9 | issue – it will be assumed for purposes of this analysis. Thus, the second Strickler component is

10 | met. Strickler, 527 U.S. at 281-82.

11 |      The investigative report prepared by a district attorney investigator concerns the statement

12 | of Quang Hua, a McDonald's customer during the robbery. Hua advised, in pertinent part, that

13 | the two suspects were black because he could see their arms as each was wearing a short-sleeved

14 | t-shirt. (ECF No. 1 at 98.) Because petitioner is Caucasian, the statement is exculpatory, making

15 | the first Strickler component met. Strickler, 527 U.S. at 281-82.

16 |      The final requirement required to establish a Brady violation involves a showing of

17 | prejudice. Strickler, 527 U.S. at 281-82. More particularly, petitioner must show a reasonable

18 | probability that the trial result would have been different had Quang Hua's witness statement

19 | been disclosed to the defense; the undersigned considers whether, in the absence of Hua's

20 | statement identifying both suspects as black, petitioner received a fair trial "resulting in a verdict

21 | worthy of confidence." Strickler, 527 U.S. at 289 (quoting Kyles, 514 U.S. at 434).

22 |      In this case, a review of the record reveals petitioner received a fair trial resulting in a

23 | verdict worthy of confidence because numerous witnesses testified that one of the suspects was

24 | Caucasian. McDonald's manager Vivian Serrato testified the suspects were "a black guy and a

25 | white guy" (ECF No. 46-4 at 157-58), throughout her testimony concerning the circumstances of

26 | the robbery, Serrato identified the actions taken by the black and white suspects (ECF No. 46-4 at

27 | 158-67), and indicated she saw the black and white suspects flee together (ECF No. 46-4 at 167-

28 | 68). Serrato also detailed the white suspects interaction with McDonald's employee Sandy Le

(ECF No. 46-4 at 168-69).  Serrato also testified as to her identification of the white suspect detained by police, noting the build, shoes and skin tone were the same; Serrato identified petitioner as the white suspect in court.  (ECF No. 46-4 at 171-73, 186.)  Serrato also testified both suspects were wearing gray hooded sweatshirts.  (ECF No. 46-4 at 156, 180.)  McDonald's employee Sandy Le testified she was on a break when two suspects entered the restaurant, but she was unable to discern skin color.  (ECF No. 46-4 at 197.)  One of the suspects took Le's purse and bag at gunpoint.  (ECF No. 46-4 at 199-200.)  Le's statements to responding officers on the date of the incident were truthful and "[m]ore fresh than now."  (ECF No. 46-4 at 202-03; see also 211-12.)  Le also testified the suspects were wearing gray sweatshirts or sweaters.  (ECF No. 46-4 at 208.)  McDonald's Jovanni Mendoza Cruz testified the two robbers were a "white male" and a black male.  (ECF No. 46-4 at 227-28.)  The white male was wearing a gray sweatshirt and carried a handgun.  (ECF No 46-4 at 228-30.)  Both suspects fled together.  (ECF No. 46-4 at 231.)  Mendoza Cruz recalled being shown a photograph of a white suspect and identifying similarities between the photograph he was shown and the white male who robbed the McDonald's.  (ECF No. 46-4 at 232-35, 257.)  McDonald's employee Jose Alvarez-Saenz testified two men entered the restaurant wearing hooded sweatshirts, one gray and one darker in color; the light-skinned man wore the gray sweatshirt and was armed with a gun. (ECF No. 46-4 at 264-65.)  The light-skinned suspect took "stuff" from people in the lobby or dining area, including employee Le.  (ECF No. 46-4 at 267.)  The "white suspect and the dark suspect" fled together and got into a green van.  (ECF No. 46-4 at 268-69.)  He only saw two people get into the van and they appeared to be its only occupants.  (ECF No. 46-4 at 289-90.)  Alvarez-Saenz recalled being shown a photograph of a light-skinned male who matched the white suspect in height and "body weight, or size," gray hooded sweatshirt and shoes.  (ECF No. 46-4 at 272-74.)  McDonald's employee Larry Xiong testified two suspects entered the restaurant and one was light-skinned in a gray sweater and armed with a gun (ECF No. 46-5 at 118-20).

Sacramento Police Officer Rosalia Cabrera confirmed that Le indicated there were two suspects and that one wearing jeans took her bag off of her shoulder (ECF No. 46-4 at 298-99), Serrato identified the suspects as a black male and white male (ECF No. 46-4 at 308, 310).

Alvarez-Saenz stated one was black and the other was male "Hispanic" with "light skin" and both had fled and gotten into a green van. (ECF No. 46-4 at 303-04, 312.) Sacramento Police Officer Michael Lange was dispatched about a robbery of a McDonald's involving suspect descriptions of one black male and one white male. (ECF No. 46-5 at 184.) Sacramento Police Officer Carlyle Mok received descriptions of the two persons seen fleeing a green van by neighbors: one a black male and the other a white or Hispanic male. (ECF No. 46-5 at 210.)

Additionally, there was evidence that when petitioner was confronted by police, he was in possession of paper money and coins. (ECF No. 46-5 at 85, 131.) And, while detained in Sacramento Police Officer Michael Peirsol's patrol car, petitioner was recorded stating, "I robbed them motherfuckers for my family bra." (ECF No. 46-5 at 91.)

The record reveals significant evidence of a white or light-skinned male and a black male suspect. Hua's statement that both suspects were black would stand alone against the testimony of numerous other witnesses. Moreover, Hua's statement differs greatly from the testimony of all other witnesses as to the suspects' clothing: all who testified agreed the suspects were wearing sweatshirts rather than the short-sleeved t-shirts Hua claimed allowed him to discern the suspects' skin color.

In light of the significant evidence pointing to two suspects, one black and one Caucasian or light skinned Hispanic, it is not reasonably probable Quang Hua's statement or testimony – had it been admitted - would have resulted in an untrustworthy trial or unfair verdict. Therefore, the state court's determination in this regard was reasonable. 28 U.S.C. § 2254(d).

As a result, petitioner's remaining related claims should also be denied. More particularly, petitioner cannot show trial counsel or appellate counsel acted deficiently. Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. "This includes a duty to ... investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict." Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001), amended by 253 F.3d 1150 (9th Cir. 2001) (citing Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)). On the other hand, where an attorney has

consciously decided not to conduct further investigation because of reasonable tactical evaluations, his or her performance is not constitutionally deficient.  See Babbitt v. Calderon, 151 F.3d at 1173.  Whether trial counsel had received Quang Hua's statement is not known; perhaps she did receive it and elected not to pursue it in light of the dearth of other witness statements pointing to a while male suspect.  Certainly, Hua's statement is the only statement to identify both suspects as black, and those that did indicate a possible Hispanic suspect indicated the suspect was light skinned.  Even assuming deficiency, petitioner's claims fail.

For the reasons outlined in the facts cited above, petitioner cannot establish prejudice under the Strickland standard, for it is not reasonably probable that had defense counsel investigated and discovered the withholding of exculpatory evidence, the outcome of the trial would have been different.  Strickland, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable."  Richter, 562 U.S. at 112.  Here, while perhaps a different result is theoretically conceivable, such a result is not substantial.

The same can be said of appellate counsel.  Petitioner was required to show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue.  Smith, 528 U.S. at 285; Miller v. Keeney, 882 F.2d at 1434 (counsel is not deficient for failing to raise a weak issue).  Petitioner did not overcome the "strong presumption that [appellate] counsel's conduct [fell] within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  Nor did petitioner show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.  Smith, 528 U.S. at 285-286.

In sum, petitioner's claims, as presented in grounds three through six, should be denied as the state court determinations regarding these claims were reasonable, and were not contrary to Supreme Court precedent.  28 U.S.C. § 2254(d).  Therefore, petitioner is not entitled to habeas relief.

////

////

40

1    D.    *The <u>Faretta</u> Claim & Related Ineffective Assistance Claims*

2        In ground seven, petitioner contends the trial court erroneously denied him the right to

3    represent himself.  (ECF No. 18 at 44-46.)  In ground eight, petitioner contends trial counsel was

4    ineffective during the <u>Faretta</u> proceedings (ECF No. 18 at 46-47) and that appellate counsel was

5    ineffective for failing to raise trial counsel's ineffectiveness in that regard (ECF No. 18 at 47-48).

6    Respondent maintains the state superior court's determination was reasonable.  (ECF No. 44 at

7    32-34.)

8                    <u>The State Court's Determination of the Claim</u>

9        The Sacramento County Superior Court denied this claim in a reasoned decision following

10   a petition for writ of habeas corpus filed in that court:

11          Petitioner also claims that the court erred in denying his timely
            request to represent himself based on the opinion of a mental health
12          expert that petitioner did not have the ability to think on linear terms,
            when the record showed he was of present sound mind.  He claims
13          that trial counsel was ineffective in failing to properly represent him
            in his effort to obtain the self-representation, and that appellate
14          counsel was ineffective in failing to raise the issue on appeal.  In
            support, he attaches Exhibit B, which is a copy of reporter's
15          transcript from the judgment and sentencing hearing after trial and
            conviction, of his motion to self-represent at that time; the transcript
16          shows petitioner's request for self-representation, the prosecutor's
            reference to a recent report by Dr. Mattiuzzi opining that although
17          petitioner was competent to stand trial he was not competent to
            represent himself; petitioner agreeing to talk to Dr. Mattiuzzi again
18          and the court considering the issue after that occurred; that at a
            subsequent hearing, the court had read Mattiuzzi's second report and
19          noted Mattiuzzi's opinion that petitioner has a severe mental disorder
            that would prevent petitioner from self-representing without the
20          assistance of counsel that being the inability to engage in linear and
            analytical thinking; and that the court denied the self-representation
21          motion under <u>People v. Johnson</u> (2012) 53 Cal.4th 519.

22          Petitioner fails to show any error on the trial court's part in denying
            the self-representation motion.  The United States Supreme Court
23          held in <u>Indiana v. Edwards</u> (2008) 554 U.S. 164 that the right to self-
            representation is not absolute and allows the states to deny self-
24          representation when the defendant lacks the mental capacity to
            conduct a defense at trial without the assistance of counsel, even
25          though the defendant is competent to stand trial, and <u>Johnson</u> adopted
            this rule for California courts.  Thus, the trial court had authority to
26          deny self-representation even though defendant had been found
            competent to stand trial.  Nor does petitioner attach any reasonably
27          available documentary evidence that could have been introduced to
            counter Dr. Mattiuzzi's two expert psychiatric reports on the issue
28          and show that the trial court erred in following those reports, despite

                                41

the court's conclusions about the sophistication of petitioner's criminal behavior that were stated later in the sentencing hearing. As such, the claim is denied.

(LD 10 at 4.)

## The Applicable Legal Standards

A criminal defendant has a Sixth Amendment right to self-representation. <u>Faretta v. California</u>, 422 U.S. 806, 835 (1975). This right, however, is neither automatic nor without qualification. To properly invoke the right, the defendant must be competent, and the request must be "timely, not for purposes of delay, unequivocal, voluntary, [and] intelligent[.]" <u>United States v. Maness</u>, 566 F.3d 894, 896 (9th Cir. 2009) (per curiam). No specific colloquy is required by the Constitution or the decision in <u>Faretta</u>. <u>Lopez v. Thompson</u>, 202 F.3d 1110, 1117 (9th Cir. 2000) (en banc).

The United States Supreme Court held the same standard is used to determine a defendant's competence to stand trial, and his or her competence to waive counsel under <u>Faretta</u>. <u>Godinez v. Moran</u>, 509 U.S. 389, 396-402 (1993). This unitary competency standard is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.' [Citations.]" <u>Id.</u> at 396.

In <u>Indiana v. Edwards</u>, 554 U.S. 164 (2008), the United States Supreme Court stepped back from <u>Godinez</u> and held the trial court was not required to permit a defendant to represent himself at trial if he evidenced mental illness even though he had been found competent to stand trial. The <u>Edwards</u> court determined the ability to conduct one's own defense requires a higher degree of functionality than does the lesser role of a represented defendant. <u>Id.</u> at 173-75. Therefore, one may be mentally competent to stand trial yet lack the expanded degree of competence necessary to represent oneself in that trial. <u>Id.</u> at 176-78.

[T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to

> stand trial ... but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

Edwards, 554 U.S. at 177-78.

In reaching this conclusion, Edwards distinguished Godinez: the defendant in that case only sought to represent himself to enter a guilty plea rather than to conduct trial proceedings; Godinez never considered the defendant's ability to conduct a defense. Edwards, 554 U.S. at 173. "Godinez involved a State that sought to *permit* a gray-area defendant [trial-competent but otherwise mentally impaired] to represent himself. Godinez's constitutional holding is that a State may do so. But that holding simply does not tell a State whether it may deny a gray-area defendant the right to represent himself—the matter at issue here." Id. at 173, italics in original.

> Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways.... In certain instances an individual may well be able to satisfy [the] mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel.

Edwards, 554 U.S. at 175-76.

Hence, Edwards recognized "a mental-illness-related limitation on the scope of the self-representation right." Edwards, 554 U.S. at 171. Nevertheless, the Supreme Court declined to adopt "a more specific standard" (id. at 178), leaving it instead to the discretion of the "trial judge ... [who] will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." Id. at 177.

<u>The Relevant Proceedings</u>

Following jury trial, on April 26, 2013, petitioner advised the court he wished to represent himself. (1 CT 34.) Paul G. Mattiuzzi, M.D., was appointed that same date to determine whether petitioner was competent to represent himself. (1 CT 34; 2 CT 189-90.)

More particularly, the following colloquy occurred on April 26:

> THE COURT: All right. With regard to the matter of People versus Oliver Gray, Mr. Gray has made a Faretta motion.

43

And, Mr. Gray, we have had some discussion about that, and you wanted also to further talk about that.

What would you like to say?

THE DEFENDANT: Tami Buscho brought up the issue of doctors evaluating me on my competency to represent myself. I would like to say that I am not on any psychotropic medication or anything like that. I believe that I am competent to represent myself.

If you would like to have another doctor come and evaluate me, I would be willing to converse with that doctor, but I would just like to exercise my right to represent myself and ask for a continuance to prepare my own new trial motion.

THE COURT: All right. I will say this: I have had a fairly extensive amount of time to talk with you, both in the Marsden motion today and the previous Marsden motion, and in both of those motions, it is apparent to this Court that, in fact, you were able to follow the proceedings that occurred throughout this entire trial.

You seem to have a fairly good understanding of what happened throughout the trial.

I would also comment, however, that you seem to have limited education, as reflected a little bit in the way you speak. It's also reflected in some of the words that you use.

The Court has provided you with a document that reflects the pro per privileges that would be available to you, and the Court has also already advised you in part that representing yourself does not come with any special privileges.

Do you understand that?

THE DEFENDANT: Yes, I do.

THE COURT: Representing yourself means that you are held to the same standard as an attorney.

Do you understand that?

THE DEFENDANT: I understand that.

Can I say that I have a GED. I understand my limited education, but I would like to say I speak English and I speak clearly, and I'm gonna leave it at that.

THE COURT: I will comment on that. As we have had our conversations, both today and last week, we were able to converse with one another. I understood what you were saying. I understood your points, and that is fundamental to the communication skills, which reflects for me that you do understand what's going on.

So this Court is actually willing to entertain allowing you to represent

yourself, but I do want you to read that document that I have provided to you so you know specifically what it entails when you represent yourself.

The Court will then give you an opportunity to request it, to provide or to prepare a new trial motion, and the Court would then consider that, but I want you to be aware of the serious step you're taking, the consequences of that step and the potential exposure you have with regard to sentencing in this case, and the fact that those are all things that you're understanding.

You also need to understand that if you make mistakes in representing yourself, it's not going to essentially result in some kind of benefit to you on appeal. You don't get a benefit from that.

Do you understand that?

THE DEFENDANT: Yes, I do.

I would like to say I have already previously attempted to file a Faretta motion. So I understand it. I have read it, and I'm gonna leave it up to you to make a judgment.

THE COURT: All right. Well, if you have read all that, why don't you go ahead and sign it, if you're familiar with it all.

You have no questions about anything on that document?

THE DEFENDANT: None at all.

(Defendant now signing the document.)

THE COURT: Did you fill it all out?

THE DEFENDANT: What's the date today?

[PROSECUTOR]: The 26th of April.

THE COURT: At the very bottom there, there is a signature, that's for me, not for you.

THE DEFENDANT: Yes, I understand. It says Superior Court judge.

THE COURT: I want you to fill out everything else.

[PROSECUTOR]: Your Honor, may I have an opportunity to be heard?

THE COURT: You will.

[PROSECUTOR]: Thank you.

(Pause.)

THE COURT: We provided you with a second sheet.

1       Have you seen that, Mr. Gray?

2       THE DEFENDANT: Yes.

3       THE COURT: All right. Let's walk through it and make sure you understand it.

4

      You have the right to be represented by an attorney at all stages of

5 the case.

6       If you can't afford one, one will be appointed for you, just like it has been. Ms. Buscho has been representing you.

7

      Do you understand that?

8

      THE DEFENDANT: Yes, I do.

9

      THE COURT: You also understand, as I have already explained to

10 you, it's not a wise move to proceed without an attorney when you are going against skilled and experienced attorneys like [the

11 prosecutor].

12       Do you understand that?

13       THE DEFENDANT: We all have our opinion of why it is, but I can agree with that.

14

      THE COURT: That is a fair statement.

15

      Do you understand that the maximum exposure in this case is what

16 is reflected in the probation report, and that's 47 years -- I believe it's 47 years, 8 months.

17

      THE DEFENDANT: Yeah, I seen the probation.

18

      THE COURT: Do you understand this Court's not going to help you

19 present any arguments during any of the proceedings?

20       THE DEFENDANT: Yeah, I do.

21       THE COURT: All right. You have to comply with all the rules of criminal procedure and evidence.

22

      Do you understand that?

23

      THE DEFENDANT: Uh-huh, yes.

24

      THE COURT: Is that yes?

25

      And if you are -- and if you basically are dissatisfied with the process

26 of judgment and sentencing, you can't use your incompetence at representing yourself for any basis for appeal.

27

      Do you understand that?

28

1          THE DEFENDANT: Yeah.

2          THE COURT: You always have the right to hire an attorney.

3          Do you understand that as well?

4          THE DEFENDANT: Yes, I do.

5          THE COURT: Okay.

6          THE DEFENDANT: But I don't have the money to fund an attorney,
           but all right. I understand that I could buy an attorney if I had the
7          money, but go ahead.

8          THE COURT: Okay. We've talked about your background and the
           fact that you have limited education.
9
           We've talked about the knowledge you have with regard to the court
10         s[ys]tem. You've been in the court system a fair amount, so you
           probably have some experience from that, but you think you're
11         knowledgeable about the way the court system works?

12         THE DEFENDANT: I know how to read, write, and I can see what's
           going on, and I understand what's going on, and I basically can
13         comprehend what I am reading and seeing, yes.

14         THE COURT: All right. Do you think that that's -- do you think any
           deficiency exists that might prevent you from representing yourself?
15
           THE DEFENDANT: Can you say -- can you be specific on
16         deficiencies?

17         THE COURT: Sure. We have talked in this trial about the fact that
           had some at least some neurological impairment.
18
           Do you think that that neurological impairment is gonna affect you
19         as you try to represent yourself?

20         THE DEFENDANT: No, I do not. Not at the moment.

21         THE COURT: All right. Do you want to represent yourself in this
           matter?
22
           THE DEFENDANT: Yes, I do.  That's what I am requesting.
23

24    (ECF No. 46-7 at 80-86.)  The court then heard from the prosecutor who expressed concern that a

25    defendant legally competent to stand trial may not likewise be competent to represent himself at

26    trial.  (ECF No. 46-7 at 86-87.)  Petitioner thereafter agreed to meet with Dr. Mattiuzzi on the

27    issue.  (Id. at 88-89.)  On June 3, 2012, once the trial court had reviewed the doctor' report,

28    further proceedings were held:

                                                 47

[THE COURT]: And Dr. Mattiuzzi concludes[5] that in fact the defendant should not represent himself as a result of various -- various difficulties and disorders that have been identified by Dr. Mattiuzzi.

The Court has also had a chance to go back and his narrative that in fact your linear -- your thinking is more linear and you are more in command of case relevant information than when he previously spoke with you.

But despite those conclusions, he does still believe that, in fact, it would be an injustice for you to represent yourself in this matter.

Is there some reason why I shouldn't follow his recommendation that you think would be appropriate for the Court to hear?

THE DEFENDANT: Can I ask that you specify in detail what exactly is enabling me from representing myself due to mentally disorder? Can you specify on what task or what he believes that I'm not competent to represent myself?

THE COURT: He thinks that in fact the complexity of the trial process and the inability to engage in linear thinking and analytical thinking would prevent you from representing yourself in this matter.

THE DEFENDANT: What is linear?

THE COURT: Linear means you're doing it progressively, along the line. So, for example, a simple linear thinking would be you have a line that goes from this point to this point and you walk along the line. That's linear thinking.

Does that make sense to you?

THE DEFENDANT: Yeah, it makes sense.

THE COURT: Pardon me?

THE DEFENDANT: Yes.

THE COURT: All right. Any other comment you'd like you're not competent to represent yourself.

THE DEFENDANT: All right. Can I say one thing on fundamentally fair. The whole reason that I initiated representing myself was because Tami Buscho refused to do a new trial motion. And I don't believe that it would be fundamentally fair being represented by counsel who are refusing basically to do an obligation as counsel and protect my rights in this case.

---

[5] Dr. Mattiuzzi's report concluded that petitioner "suffers from a severe mental disorder that would prevent him from carrying out the tasks needed to represent him or herself in court without the assistance of counsel, and that he is therefore not mentally competent to represent himself…" (SEALED CT 574-86 [5/30/13 Mattiuzzi, at 5].)

48

THE COURT: All right. I understand that. I think I understood that previously.

Anything else by counsel on this matter?

[PROSECUTOR]: No, your Honor.

[DEFENSE COUNSEL]: No, your Honor.

THE COURT: All right. The Court is going to deny the request to represent yourself Mr. Gray. The Court has indicated it does think this falls into the gray area specified in the Johnson case. The Court also thinks in this particular case representation of yourself would be an injustice.

Faretta motion is denied.

THE DEFENDANT: Actually could I say that I disagree with the ruling and you abuse your discretion. And that I would like to move for a different judge-to hear this matter.

THE COURT: You can say that. Your request is denied.

(ECF No. 46-7 at 93-95; see also 1 CT 35.)

Analysis

As noted above, the United States Supreme Court has held that an individual found competent to stand trial may be incompetent for purposes of self-representation. The latter requires a higher degree of functionality. Edwards, 554 U.S. at 173-75.

Here, the trial court considered its own observations of petitioner during trial proceedings, among other concerns raised by the prosecutor, before ultimately obtaining petitioner's acquiescence to meeting with a mental health professional who would assess petitioner's competency for purposes of self-representation during sentencing and post-trial motions. When Dr. Mattiuzzi's report indicated that in his expert opinion petitioner was unable to competently represent himself due to impairments in linear and analytical thinking, among other factors, the trial court denied petitioner's Faretta request on that basis. In so doing, the trial court acted within its discretion, making a "more fine-tuned mental capacity" decision, "tailored to the individualized circumstances" particular to petitioner. Edwards, at 177.

The undersigned finds the record supports the state court's denial of petitioner's claim as it involves neither an unreasonable application of, nor is it contrary to, Supreme Court precedent.

49

As a result, petitioner's claim as asserted in ground seven should be denied.

Finally, because grounds eight and nine are dependent upon a finding that petitioner is entitled to relief on the claim asserted in ground seven, and as acknowledged yet not conceded by petitioner (ECF No. 18 at 47-48), because the claim asserted in ground seven is found to be without merit, the undersigned also recommends the related claims asserted in grounds eight and nine lack merit and should be denied. Where petitioner cannot prevail on the merits of his Faretta based claim, neither can he prevail on the related claims that trial and appellate counsel provided ineffective assistance in this regard. Strickland v. Washington, 466 U.S. at 687-688, 694; Jones v. Barnes, 463 U.S. at 753.

In sum, the state court determination was reasonable and precludes relief on petitioner's claims as asserted in grounds seven, eight and nine. 28 U.S.C. § 2254(d). Thus, those claims too should be denied.

VI.  Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the

////

////

////

specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

F.2d 1153, 1156 (9th Cir. 1991).

Dated:  March 25, 2020

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/gray1577.157.kjn